UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN SMITH,

    Petitioner,                                           CASE NO. 2:14-CV-11540
                                                       HONORABLE PAUL D. BORMAN
v.                                                      UNITED STATES DISTRICT JUDGE

RANDALL HAAS,

    Respondent.

_____/

**OPINION AND ORDER DENYING (1) THE PETITION FOR WRIT OF HABEAS CORPUS, (2) A CERTIFICATE OF APPEALABILITY, AND (3) LEAVE TO APPEAL IN FORMA PAUPERIS**

Kevin Smith, ("petitioner"), confined at the Bellamy Creek Correctional Facility in Ionia, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, petitioner challenges his conviction for assault with intent to murder, Mich. Comp. Laws § 750.83, assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84, two counts of possession of a firearm during the commission of a felony (felony-firearm), Mich. Comp. Laws § 750.227b, and felon in possession of a firearm, Mich. Comp. Laws § 750.224f. For the reasons stated below, the application for a writ of habeas corpus is DENIED WITH PREJUDICE.

**I. BACKGROUND**

Petitioner was convicted following a jury trial in the Macomb County Circuit Court. Petitioner's conviction arose from an incident in which petitioner fired gunshots into a home occupied by Angel Rankin, the mother of petitioner's three year old daughter. This Court recites

verbatim the relevant facts regarding petitioner's conviction from the Michigan Court of Appeals' opinion affirming his conviction, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant and Rankin were engaged in a paternity battle during the summer of 2011, at which point Rankin insisted that defendant take a DNA test, which was completed in July 2011. The DNA test was required for Rankin to receive child support from defendant. Rankin received Facebook messages from defendant in which defendant threatened Rankin and told her that he wanted a DNA test. Rankin also received Facebook messages from defendant's girlfriend, Latasha Hudson, in which Hudson told Rankin to "grow up" and that defendant wanted joint custody if the DNA test confirmed that he was Leanna's father. While defendant and Rankin were at the facility to administer the DNA test, defendant confronted Rankin about her feelings regarding Hudson. On August 19, 2011, Rankin and defendant received the results of the DNA test, which confirmed that defendant was Leanna's father. Rankin and defendant were to appear in court following the results to determine defendant's child support payments.
>
> The next day, on August 20, 2011, defendant and Hudson went to Rankin's house. They drove by Rankin's house several times, at which time they saw two vehicles in the driveway. Defendant parked the car one block from Rankin's house and exited the car, at which time Hudson moved into the driver's seat. Defendant stood on the sidewalk, approximately 30 feet away from Rankin's house, and fired six shots into Rankin's living room. Defendant fired the six shots, the total capacity of his Colt Anaconda 44 Magnum revolver.
>
> Detective Shannon Makowski of the Roseville Police Department described Rankin's living room as having a couch along the east wall, a smaller couch along the north wall, a television and entertainment center on the south wall, and a large picture window that faced Lehner Street on the west wall. Rankin's boyfriend, Rashard Rice, testified that a person would be able to see through the blinds of the living room, even when the blinds were closed. In addition, Rice said, "If the TV is on, the light faces towards the back wall. And if someone walks past, you can see the shadow in the blinds. They were cream blinds. If somebody walk [sic] past them, you can see the shadow from the light of the TV." Rice based this on previous experiences, specifically, that when he arrived at Rankin's home and the television was on in the living room, he could see Rankin's shadow as she walked through the living room and to the front door.
>
> Defendant testified that he intended only to scare Rankin. Despite defendant's contention that he intended to fire his revolver at the television, there were no bullet holes in the television. Defendant admitted that he could see the light that emanated

from the television, that it was a fair assumption that people were in the living room, and that he knew it was a possibility that Rankin's children would be home with Rankin when he fired his gun. Defendant did not fire his gun at Rankin's garage or the empty cars on her driveway because it would not have sufficiently scared Rankin. The bullets were retrieved from the wood frame in the couch and a wood beam in the laundry room, at locations approximately waist high from the floor. There were bullet holes in the interior door that were slightly lower and a couple of feet away from the waist-high television, which was in front of the couch where Rankin and her one year old son, Phillip Mulligan, took cover after defendant fired the first two shots. From this evidence, a rational fact finder could infer that defendant could see the shadows of Rankin and Mulligan, fired six shots from a powerful revolver at or toward them, that defendant was angry about his paternity battle with Rankin, and that defendant actually intended to kill Rankin.

*People v. Smith,* No. 309950, 2013 WL 2319515, at *1-2 (Mich.Ct.App. May 28, 2013).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 495 Mich. 880, 838 N.W. 2d 549 (2013)(Table).

Petitioner seeks habeas relief on the following ground:

Petitioner's assault and felony firearm convictions must be reversed where the prosecution failed to present sufficient evidence of intent to satisfy the due process standard of guilt beyond a reasonable doubt.

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)(*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state

4

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.*  Habeas relief is not appropriate unless each ground which supported the state court's decision is examined and found to be unreasonable under the AEDPA. *See Wetzel v. Lambert*, 132 S. Ct. 1195, 1199 (2012).

"[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington,* 562 U.S. at 102.  Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.*  Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citing *Jackson v. Virginia,* 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring in judgment)).  Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford,* 537 U.S. at 24.  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

### III.  DISCUSSION

Petitioner claims that the prosecutor failed to present sufficient evidence to support his

conviction for assault with intent to commit murder, assault with intent to do great bodily harm less than murder, and two counts of felony-firearm.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. at 318-19(internal citation and footnote omitted)(emphasis in the original). Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence at trial to exclude every reasonable hypothesis except that of guilt. *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000)(internal quotations omitted).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions

that they believe to be mistaken, but that they must nonetheless uphold." *Id*. In fact, the *Jackson* standard "is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011)(quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)(internal quotation marks omitted)). Therefore, for a federal habeas court reviewing the sufficiency of evidence for a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S.Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir.2003).

Petitioner first contends that there was insufficient evidence that he specifically intended to kill Angel Rankin, so as to sustain his conviction for assault with intent to commit murder.

Under Michigan law, the elements of assault with intent to commit murder in Michigan are: (1) an assault; (2) with an actual intent to kill; (3) which if successful, would make the killing murder. *See Warren v. Smith,* 161 F.3d 358, 361 (6th Cir. 1998); *See also Steele v. Withrow,* 157 F. Supp. 2d 734, 740 (E.D. Mich. 2001). The intent to kill element does not equate with murder. *Warren,* 161 F.3d at 361 (citing *People v. Taylor*, 422 Mich. 554; 375 N.W.2d 1, 7 (1985)). Thus, an intent to kill for purposes of this offense may not be proven by

7

an intent to inflict great bodily harm or a wanton and wilful disregard of the likelihood that the natural tendency of the acts will likely cause death or great bodily harm. *Id*. A conviction for assault with intent to commit murder must be premised upon a defendant's specific intent to kill. *Steele,* 157 F. Supp. 2d at 740 (citing *People v. Edwards*, 171 Mich.App. 613, 620; 431 N.W. 2d 83 (1988)). The intent to kill, for purposes of the crime of assault with intent to commit murder, need not be proved by direct, positive, or independent evidence, and the trier of fact may draw reasonable inferences from the facts and evidence in determining the existence of an intent to kill. *See Taylor*, 422 Mich. at 567-68. In determining the defendant's intent, a court may take into account "[t]he nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made." *Id.* at 568 *(*quoting *Roberts v. People*, 19 Mich. 401, 415-16 (1870)); *Warren,* 358 F.3d at 361. The use of a lethal weapon will support an inference of an intent to kill. *Steele,* 157 F. Supp. 2d at 740.

The record reflects that petitioner met and began dating Angel Rankin in 2008, while on a break from his relationship with Latasha Hudson. (Tr. 3/8/12, pp. 92, 129). Petitioner had four children with Hudson, and, while they were separated, he had another child with Rankin. (Tr. 3/7/12, p. 98; Tr. 3/8/12, pp. 92, 94, 129). This child was born on March 6, 2009. (Tr. 3/7/12, p. 95). Shortly after the child was born, petitioner severed all contact and returned to his relationship with Hudson. (Tr. 3/8/12, p. 92).

In June 2011, Rankin applied for cash assistance from the Department of Human Services and needed to prove the identity of her daughter's father to receive child support payments. (Tr. 3/7/12, p. 99). As a result, the State ordered a DNA test. (Tr. 3/7/12, p. 165). Petitioner and Hudson began sending Facebook messages to Rankin, threatening her, and Hudson called and sent a letter. (Tr. 3/7/12, pp.101-102). In response, Rankin filed a police report. (Tr. 3/7/12, p. 103). On July 18, 2011, the DNA test was completed. (Tr. 3/7/12, p. 99). This was the first time that petitioner had seen Rankin since July 2009. Petitioner last saw his daughter approximately three months after her birth in June 2009. (Tr. 3/8/12, pp. 91, 212-213). The DNA test results came in the mail on August 19, 2011, confirming that petitioner was the child's father and a court date was scheduled to determine child support payments. (Tr. 3/7/12, pp. 103-104, 134).

The next day, petitioner took his other children to a birthday party at his half-sister's house in Detroit. Petitioner used his half-sister's vehicle to pick up Hudson from work, then drove to Rankin's house in Roseville, saw vehicles parked in her driveway, parked the vehicle one street over and exited the vehicle. Hudson then moved to the driver's seat, as petitioner stood on the sidewalk in front of Rankin's house, aimed for the room lit up by a television, and fired six gunshots into the window. (Tr. 3/8/12, pp. 95-96,114-115, 203).

While petitioner admitted that he fired six gunshots from the sidewalk into Rankin's house, he claimed that he did not intend to hurt anybody. (Tr. 3/8/12, pp.140-141, 200-205). Petitioner testified that he was aiming for the television and was only trying to scare Rankin. (Tr. 3/8/12, p. 189; Tr. 3/9/12, pp. 12-13, 42-43). While bullets landed in or near the livingroom couch, there were no bullet holes near the television. (Tr. 3/7/12, pp. 74-75, 91).

9

The Michigan Court of Appeals rejected petitioner's claim finding:

The bullets were retrieved from the wood frame in the couch and a wood beam in the laundry room, at locations approximately waist high from the floor. There were bullet holes in the interior door that were slightly lower and a couple of feet away from the waist-high television, which was in front of the couch where Rankin and her one year old son, Phillip Mulligan, took cover after defendant fired the first two shots. From this evidence, a rational fact finder could infer that defendant could see the shadows of Rankin and Mulligan, fired six shots from a powerful revolver at or toward them, that defendant was angry about his paternity battle with Rankin, and that defendant actually intended to kill Rankin. Therefore, viewing the facts in the light most favorable to the prosecution, a rational trier of fact could conclude that defendant actually intended to kill Rankin.

*Smith*, 2013 WL 2319515, at *2.

The fact that petitioner intentionally pointed and unloaded his firearm in the direction of a couch where Rankin and her one year old son took cover, was sufficient evidence from which a reasonable factfinder could find beyond a reasonable doubt that petitioner actually intended to kill Angel Rankin. *See Johnigan v. Elo,* 207 F. Supp. 2d 599, 608 (E.D. Mich. 2002). Moreover, the fact that petitioner fired multiple gunshots also supports a finding that petitioner intended to kill Rankin. *See Steele v. Withrow,* 157 F. Supp. 2d at 740. A review of the record reveals that, while there was conflicting evidence, there exists a factual basis upon which the state court finding that petitioner possessed the intent to kill may be supported, so as to deny petitioner habeas relief. *Warren,* 161 F. 3d at 362.

Petitioner further argues that there was insufficient evidence that he specifically intended to inflict great bodily harm upon Phillip Mulligan, so as to support his conviction for assault with intent to do great bodily harm less than murder.

The Michigan Court of Appeals rejected petitioner's claim as follows:

Defendant stood on the sidewalk at a distance of approximately 30 feet front Rankin's living room. The shots were fired at a 90 degree angle. Mulligan was

10

> hospitalized for three days at St. John Hospital, and then transferred to Children's Hospital in Detroit. Mulligan had surgery to remove a bullet fragment from his eyelid and pieces of glass from his forehead. He also had a bullet fragment in the top of his head.
>
> Defendant conceded that it was a fair assumption that there were people in the living room, given that he could see the light from the television. Rice testified that when the television in the living room was on, an individual that stood outside could see shadows in the living room. Defendant knew it was a possibility that Rankin's children would be home with Rankin when he fired his gun. So, again, it is fair to conclude that defendant saw two shadows in the living room and fired six shots at Rankin and Mulligan.

*Smith,* 2013 WL 2319515, at *3.

Under Michigan law, the elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder. *Lovely v. Jackson,* 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004)(citing *People v. Mitchell,* 149 Mich. App. 36, 38; 385 N.W. 2d 717 (1986)). The term "intent to do great bodily harm less than murder" has been defined as an intent to do serious injury of an aggravated nature. *Mitchell,* 149 Mich. App. at 39.

A rational trier of fact could have concluded from the evidence presented that petitioner intended, at a minimum, to inflict great bodily harm on Mulligan when he fired multiple gunshots into the living room of a house that was occupied by two persons. The Michigan Court of Appeals' determination that there was sufficient evidence to support petitioner's conviction for assault with intent to do great bodily harm was reasonable, thus, defeating petitioner's claim for relief. *See Bradley v. Birkett*, 192 F. App'x 468, 480-81 (6th Cir. 2006).

The third and final portion of petitioner's claim alleges that "in absence of sufficient proof of either intent, the prosecution also failed to prove that Petitioner possessed a firearm

11

during the commisssion (sic) or attempt to commit either assault." (Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus, p. 13). The elements of felony-firearm are that the defendant possessed a firearm while committing, or while attempting to commit, a felony offense. See *Parker v. Renico,* 506 F.3d 444, 448 (6th Cir. 2007). By finding that sufficient evidence exists to sustain petitioner's convictions for assault with intent to murder and assault with intent to do great bodily harm less than murder, petitioner's use of a firearm during the commission of these felonies clearly supports his convictions for felony-firearm. *Smith,* 2013 WL 2319515, at *3. There was sufficient evidence for a rational trier of fact to support petitioner's convictions. Petitioner's claim is meritless and not entitled to habeas relief.

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because reasonable jurists would not find this Court's assessment of petitioner's claim to be debatable or wrong. *Johnson v. Smith,* 219 F. Supp. 2d 871, 885 (E.D. Mich. 2002). The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

## IV. CONCLUSION

Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus. The Court further **DENIES** a certificate of appealability and leave to appeal *in forma pauperis*.

**SO ORDERED.**

                                                s/Paul D. Borman
                                                PAUL D. BORMAN
                                                UNITED STATES DISTRICT JUDGE

Dated: September 29, 2015

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2015.

                                                s/Deborah Tofil
                                                Case Manager